UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Julie A. Ghio (Eastman),

      Plaintiff,

      v.                                 Civil Action No. 2:10-CV-62

Michael J. Astrue,
Commissioner of Social Security,

      Defendant.

## OPINION AND ORDER
(Docs. 8, 11)

Plaintiff Julie A. Ghio brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and reversal of the decision of the Commissioner

of Social Security ("Commissioner") that denied Ghio's applications for disability

insurance benefits ("DIB") and Supplemental Security Income ("SSI").  Pending before

the Court are Ghio's motion seeking an order reversing the Commissioner's decision

(Doc. 8), and the Commissioner's motion seeking an order affirming his decision (Doc.

11).

For the reasons set forth below, the Court DENIES Ghio's motion to reverse and

remand (Doc. 8) and GRANTS the Commissioner's motion to affirm (Doc. 11).  The

Court concludes that oral argument is not required pursuant to L.R. 7(a)(6).

**Factual Background**

I.      **Non-Medical Evidence and Testimony**

Ghio was born in September 1971, and completed the tenth grade.  (AR 28, 36.)
She was approximately thirty-two years old when she alleges she had to quit working
because of her disabilities.  (AR 27.)  Ghio worked as an assistant manager at several
convenience stores, in customer service at a discount department store, and as a cook at a
nursing home.  (AR 119.)  In April 2006, Ghio filed a claim for DIB alleging that she has
been unable to work since May 1, 2004 due to back pain, anxiety attacks, and depression.
(AR 86, 109-16.)  At the same time, Ghio filed a claim for SSI alleging that she has been
unable to work since May 8, 2004.  (AR 93.)

At the administrative hearing in January 2008, Ghio was asked to describe her
physical ailments that would keep her from performing sedentary work.  (AR 29.)  Ghio
responded, "[t]he pain in my back, my hips, and the numbness and tingling in my leg."
(AR 29.)  Ghio stated that her back surgery in March 2005 was unsuccessful, and that she
continues to have pain in her back and left leg.  (AR 29-30.)  Ghio testified that she is
only able to walk about fifty feet at one time, and that is "not without pain, and
discomfort, and numbness."  (AR 31.)  She stated that she is able to let her dog out in the
morning, and tries to complete household tasks "before the pain starts to get so bad."
However, she stated that she spends approximately eighty percent of her day in bed with
her feet elevated.  (AR 32.)  On a good day, she could get her laundry done.  (AR 32.)
Ghio stated that "I'm not depressed, I'm very emotional because I feel like I have been
going to doctors that haven't cared, and it just bothers me because I'm in pain so much,

and they treated me like I'm not.  Other than that, I think I have a really good life."  (AR 32.)  Ghio stated that her new doctor "thinks that probably I'll end up having more surgery."  (AR 33.)

The ALJ asked Ghio why her pain medication was not increased.  (AR 34.)  Ghio responded, "[the doctors] wouldn't give me any.  I would ask them, they would tell me to go home and take Tylenol, or they would give me 10, and I would take them and halve pills just to try to make them last a little longer."  (AR 34.)  Ghio stated that she had recently been prescribed Darvocet, which she took at night, but used tramadol and Flexeril during the day.  (AR 34.)  Ghio completed a Function Report, a Work History Report, a Disability Report, and a Pain Report all in support of her applications for DIB and SSI.  (AR 109-16, 119-31, 132-42, 143-52.)

## II.    Medical Evidence

Ghio was treated at the Community Health Plan in Rutland, Vermont intermittently from 1998 until February 2004.  (AR 186-93.)  Her treatment during that period primarily focused on her asthma, allergies, and headaches.  (AR 186-93.)  Ghio failed to keep an appointment in November 2003, but at her final appointment at this facility on February 10, 2004, Ghio complained about back pain that had been steady for the last six months.  (AR 193.)  Ghio had recently visited a chiropractor, and described her pain level as ten out of ten with pain radiating to her legs.  (AR 193.)

### A.    Rutland Regional Medical Center

Medical records submitted from Rutland Regional Medical Center describe Ghio's gall bladder removal in May 2003, a dilation and curettage procedure in November 2005,

and various emergency room visits.  (AR 194-317.)  Ghio reported to the emergency

room on March 2, 2004 complaining of excessive low back pain with pain radiating

down her left leg.  (AR 235-36.)  Ghio had some back pain the night before, but

experienced greatly increased pain in the morning.  (AR 235.)  Philip Buttaravoli, M.D.

recorded Ghio's past medical history as "intermittent back pain in the past; sometimes it

lasts for days at a time where she is incapacitated."  (AR 235.)  Dr. Buttaravoli noted

"[n]egative straight leg raising.  Raising her legs only causes lower back pain.  She has

zero deep tendon reflexes bilaterally of her lower extremities . . . no sensory or motor loss

in her lower extremities."  (AR 235.)  Ghio was injected with Depo Medrol and

bupivacaine in the left sacroiliac joint.  Ghio was "able to get off the stretcher and walk

with moderate pain relief."  (AR 235.)  Dr. Buttaravoli prescribed Anaprox pain

medication for use every twelve hours as needed, and recommended that Ghio follow up

with her primary care physician.  (AR 236.)

Ghio reported to the emergency room for back pain a second time on April 2,

2004.  (AR 237-38.)  Kirk Dufty, M.D. found no midline lumbar spine pain, but did find

paraspinal and muscle spasms lateral to mid-lumbar spine.  (AR 237.)  Ghio "was given

reassurance and further advice on back pain therapies.  Advised that she must work on

losing weight and strengthen her core muscles."  (AR 237-38.)  Ghio was stable at

discharge, and was given Vicodin for pain, along with prednisone and a Medrol dose

pack.  (AR 238.)

On June 5, 2004, Ghio was back in the emergency room complaining of increased

back pain after a visit to her chiropractor the day before.  (AR 240-41.)  Ghio's gait was

steady, and the leg raise was negative.  (AR 240.)  Ghio was prescribed eight hundred

milligrams of ibuprofen and Flexeril.  (AR 240.)  The physician's assistant wrote a note

on Ghio's behalf excusing her from work for that day and the next, but anticipating that

Ghio would return to work on Monday.  (AR 240.)

On June 19, 2004, Ghio arrived at the emergency room by ambulance complaining

of back pain.  (AR 242.)  Christopher R. Stronczak, M.D. observed that Ghio "has not

lost strength.  There has been no change in bowel or bladder character.  There is no recent

new injury."  (AR 242.)  Dr. Stronczak noted Ghio's increased back pain over the past

few weeks, and that the pain now radiated "down the posterior aspect of the left leg."

(AR 242.)  Ghio was given Ativan and Phenergan and was "far more comfortable."  (AR

243.)  Dr. Stronczak prescribed Ativan and Vicodin "to get her through the weekend,"

and noted that Ghio planned to be seen at the Spine Clinic at Dartmouth Hitchcock

Medical Center.  (AR 243.)

Ghio reported to the emergency room on July 15, 2004 after missing steps on a

stepladder and falling on her back.  (AR 244.)  An x-ray was performed and found to be

"negative."  (AR 244.)  The radiologist stated that Ghio had "a slight L4-5

spondylolisthesis.  (AR 246.)  A physician's assistant assessed Ghio as having strained

her back, and treated Ghio with eight hundred milligrams of Motrin and ice.  (AR 244.)

Ghio was directed to follow up at the Spine Clinic.  (AR 244-45.)

Ghio's next visit to the emergency room was November 13, 2004.  (AR 248-49.)

Dr. Dufty assessed Ghio as having a lumbar sprain with radiculopathy.  (AR 249.)  Dr.

Dufty observed that Ghio "does have obvious paraspinal spasm in the left, worsening

pain with straight leg raises, able to heel and toe stand without difficulty." (AR 248.) Dr. Dufty prescribed Flexeril, Nubain, Vicodin, and naproxen. (AR 249.) Ghio was instructed to stop using Darvocet and to follow up with her primary care physician. (AR 249.) On December 29, 2004, Ghio visited the emergency room again, complaining only of a migraine headache. (AR 250-51.)

Ghio's visits to Rutland Regional Medical Center in 2005 were primarily related to problems she experienced in her reproductive system. She eventually had a dilation and curettage procedure performed in November 2005, and again in March 2006. (AR 267, 289.) Ghio did not attend a follow-up appointment on December 28, 2005. (AR 269.) On January 8, 2006, Ghio reported to the emergency room for shortness of breath. (AR 271-72.) On January 29, 2006, Ghio reported to the emergency room complaining of an irregular heartbeat. (AR 277-78.)

### 1.    Todd Lefkoe, M.D. and Robert W. Giering, M.D.

Physician's Assistant Timothy Lensing referred Ghio to Todd Lefkoe, M.D. at Rutland Regional Medical Center in November 2005. (AR 254.) At the initial consultation on November 21, 2005, Dr. Lefkoe noted that Ghio had surgery for L4-5 fusion in March 2005. (AR 255.) Ghio complained that she had no improvement since the surgery. (AR 255.) Dr. Lefkoe recorded that Ghio's medications consisted of albuterol (an inhaler) and Tylenol, as needed. (AR 255.) On the questionnaire, Ghio

> admits to having depression and anxiety related to her back pain. She cries often and characterizes herself as being "very bitchy." She feels depressed over her low level of physical activity and the inability to work and support herself. Shortly after surgery she began to have anxiety attacks. These had been occurring occasionally before surgery but now happen daily. She

notes palpitations, impaired sleep and an increasing sense of social
isolation.

(AR 256.)  Dr. Lefkoe observed that Ghio sat and moved around the examination room

comfortably, and that she could perform heel and toe walking though it increased her low

back pain.  (AR 256.)  Dr. Lefkoe found some tenderness to palpation laterally that Ghio

described as "piercing pain."  (AR 256.)  Ghio was limited in forward flexion to forty-

five degrees due to pain.  (AR 256.)  Dr. Lefko also found tenderness to palpation "across

the lumbosacral paraspinals, along the length of the incision.  Additional tenderness is

noted over the sacral sulcus, sacroiliac joints, left much greater than right, left

trochanteric bursa, bilateral pubis, and bilateral ASIS."  (AR 256.)  Straight leg raising

and the slump test were negative bilaterally, though the left Gaenslen's test was positive.

(AR 256.)  Dr. Lefkoe found "bilateral sacroiliac joint pain with ipsilateral sacroiliac

joint loading."  (AR 256.)

Dr. Lefkoe had difficulty determining the source of the pain.  (AR 257.)  Dr.

Lefkoe stated that it was "unclear to me why she would have such a good response to the

diagnostic blocks, but no relief following the radiofrequency procedure."  (AR 257.)  Dr.

Lefko stated that "the lumbar facet joints may be contributing to her current pain."  (AR

257.)  At the end of the appointment, they discussed the possibility of further injections

and therapeutic exercise.  (AR 257.)  Dr. Lefkoe requested a lumbar CT scan, but as he

suspected, the fusion made it difficult to view the area.  (AR 257, 270.)  The radiologist,

however, noted that there was no abnormality identified.  (AR 270.)

At their next appointment on January 12, 2006, Dr. Lefkoe wrote that the distribution of Ghio's symptoms "suggests that we are dealing with referred pain from the pelvis or hips."  (AR 275.)  Dr. Lefkoe found trochanteric bursitis in Ghio's left hip and iliotibial band tendonitis.  (AR 275.)  Dr. Lefkoe recommended a left hip bursal injection, and Ghio agreed.  (AR 275.)  Ghio and Dr. Lefkoe agreed that Ghio would proceed with physical therapy, and Dr. Lefkoe prescribed ibuprofen.  (AR 276.)

By the time of their next appointment on February 13, 2006, Ghio had not yet started physical therapy.  (AR 284.)  Dr. Lefkoe observed Ghio's gait to be antalgic[1] on the left side.  (AR 284.)  He noted her complaint of a "slipping or snapping sensation in the central sacrum with trunk rotation and frequent muscle spasms in the left lower thorax.  (AR 284.)  Dr. Lefkoe stated his belief "that there is a mechanical component to the patient's pain."  (AR 284.)  Dr. Lefkoe prescribed Zanaflex.  (AR 284.)  Ghio still had not started physical therapy as of March 15, 2006.  (AR 292.)  Ghio had recently had a gynecological procedure performed, and though she was open to physical therapy, she could not "commit to such treatment if she does not feel well physically or needs to keep frequent gynecological appointments."  (AR 292.)  Ghio stated "that she has been feeling terribly," and was in "complete agony every day."  (AR 292.)  Ghio stopped taking the Zanaflex, and was experiencing "at least some relief" on Ultracet prescribed by another doctor.  (AR 292.)  Dr. Lefkoe recorded that he

> explained to the patient that there are several reasons to believe that a good
> portion of her pain is due to biomechanical factors.  There is simply no

_____

[1] "Antalgic" is "characterized by reduced response to painful stimuli."  STEDMAN'S MEDICAL DICTIONARY 71 (28th ed. 2006).

single anatomical lesion that would clearly explain the widespread nature of
her symptoms following her lumbar fusion.

(AR 292.)  Dr. Lefkoe encouraged physical therapy, and stated that he could not forecast

what kind of spinal injection might be helpful.  (AR 292.)  Dr. Lefkoe also was reluctant

to perform a spinal procedure if Ghio was not medically stable.  (AR 292-93.)  Ghio and

Dr. Lefkoe agreed to schedule the next appointment after Ghio's return from a two week

vacation in Florida beginning March 23, 2006.  (AR 293.)

Ghio's next appointment with Dr. Lefkoe was on May 3, 2006, a few days after

she was informed of the possibility that she would need a hysterectomy.  (AR 298.)  Ghio

had attended several physical therapy sessions, and complained that the pain was much

worse at the end of each session.  (AR 298.)  Dr. Lefkoe reviewed the physical therapist's

treatment and recorded that at the physical therapy appointment earlier that day, Ghio's

pain levels decreased following the treatment "and her pain became localized to the

region of the left SI joint.  The Patient was initially able to acknowledge this

development, and then denied it."  (AR 298.)  Dr. Lefkoe observed Ghio sit and move

around the examination room comfortably.  (AR 298.)  Dr. Lefkoe saw Ghio "grab[ ] the

low back during a portion of the examination, but otherwise demonstrates no pain

behaviors."  (AR 298.)  Ghio walked without difficulty, but had some tenderness on

palpation.  (AR 298.)  Dr. Lefkoe instructed Ghio to stop taking Lyrica during the day.

(AR 299.)  Dr. Lefkoe concluded that Ghio had not yet attended

a sufficient number of physical therapy sessions to evaluate its overall
efficacy.  The fact that her pain levels could be reduced in frequency and
scope during a single session bodes well for additional clinical
improvement.  The patient understands, however, that she must attend the

visits consistently.  I told her that the physical therapy program will not
injure her low back.

(AR 299.)  Dr. Lefkoe stated his intention to refer Ghio to a psychologist for behavioral

medicine evaluation and treatment.  (AR 299.)

Ghio's next medical appointment at Rutland Regional Medical Center was with

Robert W. Giering, M.D., a partner of Dr. Lefkoe, on December 8, 2006.  (AR 308-11.)

Dr. Giering observed Ghio walk to and from the examination room with no "evidence of

weakness, vaulting or instability of the gait."  (AR 309.)  Ghio had no atrophy in her

lower extremities.  (AR 309.)  Dr. Giering noted that Ghio's range of motion was limited

to 75 % of normal flexion and extension.  (AR 310.)  Under the section titled "Plan," Dr.

Giering wrote that he and Ghio had a

detailed discussion . . . regarding appropriate medical therapeutics.  It
should be noted that there have been issues of compliance with Dr. Lefkoe
and Dr. Mann both as well as with the physical therapists in the past.  Dr.
Lefkoe felt that there was a significant amount of psychological overlay in
this case.

(AR 310.)  Dr. Giering stated his intention that an MRI be performed.  (AR 311.)  Dr.

Giering noted that Ghio "will probably best gain control of her pain out of functionality

but I think it is premature to put her in physical therapy at this time as she has been

through it and overall this has resulted in flares of her pain."  (AR 311.)  Dr. Giering

recorded his belief that Ghio would benefit from injections as a way to isolate the source

of her pain in order to target it and eliminate it.  (AR 311.)

At Ghio's next appointment with Dr. Giering on February 22, 2007, Dr. Giering

found that Ghio's "recall is poor regarding her own medical management."  (AR 314.)

At the appointment, she rated her pain as severe and complained that "nobody is helping me." (AR 315.) Dr. Giering noted that Ghio "did not appear for an appointment on January 18, 2007. She notes that she could not get out of bed that day. She did not call to cancel the appointment. She notes to me she did not have a phone close enough to her bed . . ." (AR 315.) Dr. Giering found no evidence of weakness, vaulting, instability, or pain while ambulating. (AR 315.) Dr. Giering stated that Ghio's "range of motion is reduced which I believe is effort-related." (AR 315.) While Dr. Giering noted some diffuse tenderness to palpation he found "significant elevated reactive pain behaviors and Waddell signs." (AR 315.) Dr. Giering found that her "[s]trength seems preserved in all major lower extremity myotomal distributions today." (AR 315.)

Dr. Giering described a "fairly firm discussion" with Ghio about "compliance in the clinic." (AR 315-16.) He noted her "history of noncompliance" with Dr. Lefkoe and Dr. Mann, and her absence at a recent appointment. (AR 316.) Dr. Giering wrote that his "tendency would be to think that if a patient is in severe pain, that they would come and see their pain management specialist for help. I frankly can not [sic] understand why a patient would stay in bed instead of attending an appointment." (AR 316.) Dr. Giering stated his belief that Ghio's pain was related to "overriding depression issues," and that she should be on an anti-depressant. (AR 316.) Dr. Giering continued a prescription of Ultram despite Ghio's complaint "that she is not getting any pain relief whatsoever on Ultram at this dose. She has also noted to me that she has not gotten any pain relief whatsoever with anything anyone has ever done and she thinks that doctors 'don't help her.'" (AR 316.)

11

Dr. Giering also noted that he had been unable to obtain an MRI of Ghio's back, as "she could not tolerate it because of claustrophobia."  (AR 316.)  Ghio requested that she have the MRI performed under general anesthesia, but Dr. Giering thought the risk was too great.  (AR 316.)  Ghio "was offered conscious sedation protocol but declined that."  (AR 316.)  Dr. Giering recorded that he suspected that Ghio

> has marked elevated somatization[2] scores though she had been noncompliant with Dr. Stephen Mann and therefore, there is no assessment on the chart at this point in time from Dr. Mann.  Future consideration would be for further psychometric testing with a psychologist versus counseling.  Again, I think there is significant psychological overlay at work in this case.

(AR 316-17.)  Later that year, in October 2006, Ghio had a hysterectomy.  (AR 588-97.)

## 2.      Rutland Primary Care

Records from medical practitioners at Rutland Primary Care span February 24, 2003 through March 20, 2007.  (AR 318-83.)  Much of the handwriting is difficult to decipher.  At an appointment on February 24, 2003, the notes indicate that Ghio fell on her back onto pavement.  (AR 318.)  Ghio continued to be treated for back pain intermittently in 2003 and 2004.  Ghio was prescribed Vicodin and Flexeril.  (AR 323.)  Ghio was also treated for ear pain, gastrointestinal problems, and a cold in 2003.  (AR 319-22, 325-38.)  On November 3, 2003, Ghio complained of back pain, stating that it began two or three days prior.  (AR 339.)  Ghio did not recall any particular injury that set off the pain.  (AR 339.)  At the time of the appointment, her pain level had not

---

[2]  Somatization is defined as "the process by which psychological needs are expressed in physical symptoms; e.g., the expression or conversion into physical symptoms of anxiety, or a wish for material gain associated with a legal action following an injury, or a related psychological need."  STEDMAN'S MEDICAL DICTIONARY 1788 (28th ed. 2006).

improved after taking Flexeril and Darvocet that had been left over from the last time she had back pain.  (AR 339.)  The recommendation was that Ghio continue taking Flexeril. (AR 339.)  Ghio complained of back pain again on March 4, April 12, April 19, and May 14, 2004.  (AR 342-45.)  The providers tried various medications, including Norflex, Vioxx, and Percocet.  (AR 342-45.)  Ghio was referred to the Spine Center at Dartmouth-Hitchcock, and surgery was eventually recommended.  (AR 346, 348.)

Prior to her lumbar fusion surgery, Ghio went over some questions with a provider at Rutland Primary Care.  (AR 348.)  The provider noted that Ghio stated that she was unable to work and was unable to sit or stand.  (AR 348.)  The provider further noted that Ghio would be unable to work for the three months following surgery.  (AR 348.)  The provider also stated that Ghio needed to work on weight loss.  (AR 348.)  Ghio's pre-operative history form for her spinal surgery at Dartmouth-Hitchcock Medical Center is included in her records from Rutland Primary Care.  (AR 350-56.)  Appointments from April 2005 forward generally did not concern her back pain.  (357-63, 365-83.) However, the records include a Radiology Report dated December 23, 2005 stating that "the vertebral bodies, disc spaces, and posterior elements [were] intact," and alignment was normal.  (AR 364.)  The radiologist found that degenerative changes were not significant.  (AR 364.)  On October 21, 2005, a provider noted that Ghio was trying to get pregnant.  (AR 359.)

On June 8, 2006, Ghio reported to her appointment with paperwork to be filled out regarding her alleged disability due to back problems.  (AR 366.)  On July 20, 2006, Ghio complained about anxiety attacks up to eight times per day.  (AR 367.)  Ghio again

13

reported anxiety attacks on August 17, 2006.  (AR 369.)  On October 3, 2006, her

provider completed paperwork for "general assistance."  (AR 371.)  The last document

included in the records from Rutland Primary Care is a Radiology Report dated March

20, 2007.  (AR 384.)  Ghio was evaluated for degenerative disc disease and instability.

(AR 384.)  The report states:

> Multiple views of lumbar spine show hardware fixation screws and rods at
> L4-L5 that appear intact, stable, and show no evidence of loosening.  There
> is minimal loss of disc height at L4-L5 and L5-S1 [l]evel.  There is mild
> listhesis seen at L4-L5 that … is stable on both flexion and extension
> views.  Otherwise, lumbar spine demonstrates normal alignment.  No
> fracture or acute process is appreciated.

(AR 384.)  It is unclear who requested the Radiology Report, or how it made its way into

Rutland Primary Care's files.

### 3.    Physical Therapy - Patrick J. Cooley, D.C., P.T.

Ghio attended six sessions of physical therapy with Patrick Cooley beginning on

May 17, 2004.  (AR 385-87.)  As of the first appointment, Mr. Cooley recorded that Ghio

was employed as a cashier at Big Lots, a discount department store.  (AR 385.)  At the

second appointment, Mr. Cooley recorded that Ghio

> has a much better pain free ROM post treatment exam.  We can now
> palpate the right SI joint without pain she was having previously which had
> been sharp.  There is better rotation throughout the lumbar and thoracic
> spine.  She had some pain on palpation in the upper anterior rib joints.  We
> treated her with manipulation there also with immediate improvement.

(AR 386.)  Ghio complained of some pain at the next appointment on May 28, 2004, and

June 2, 2004, Ghio reported having difficulty standing up straight at work.  (AR 387.)

However, at the last appointment on June 8, 2004, Mr. Cooley reported that Ghio "was more up right post treatment."  (AR 387.)

Included in the records from Physical Rehabilitation and Health Center, where Mr. Cooley worked, is an assessment dated May 17, 2006 by Maurice J. Cyr, a "chiropractic physician."  (AR 388.)  Dr. Cyr stated that he was unable to support Ghio's claim for disability.  (AR 388.)  He stated that Ghio's treatment was two years prior and was for less than one month.  (AR 388.)  Dr. Cyr also stated that Ghio was working when her care began, and when she was discharged from care.  (AR 388.)

### 4. The Spine Center – Dartmouth Hitchcock Medical Center

The records from the Spine Center span from August 2004 until October 2005. (AR 389-560.)  Ghio had surgery on March 10, 2005 and was released from the hospital on March 13, 2005.  (AR 426.)  Most of the records relate to the fusion surgery for L4-5, based on a diagnosis of spondylolisthesis.  (AR 426-511.)

At Ghio's first appointment at the Spine Center on August 5, 2004, Rowland G. Hazard, M.D. recommended that they proceed with medial branch block injections.  (AR 559.)  A review of an April 2004 MRI indicated to Dr. Hazard that Ghio had "very severe facet arthropathy and exuberant bony hypertrophy through the pars at L4-5.  (AR 558.) The injections were performed on the same day.  (AR 556-57.)  That evening, Ghio experienced significant pain relief, but the pain returned to the same pre-procedure level by the following morning.  (AR 560.)

At Ghio's next appointment on October 4, 2004, Robert Rose, M.D. treated Ghio with a radiofrequency treatment.  (AR 542.)  On October 22, 2004, Ghio reported to Dr.

Hazard that she had not had any pain relief from the radiofrequency treatment.  (AR 541.)
Dr. Hazard and Ghio decided to go ahead with a CT scan and to consider surgery.  (AR
541.)

William Abdu, M.D., the doctor who eventually performed her surgery, met with
Ghio on November 16, 2004.  (AR 539.)  Dr. Abdu diagnosed Ghio with symptomatic
spondylolisthesis.  (AR 539)  Dr. Abdu was able to reproduce back pain with the straight
leg-raising test, but could not reproduce the leg pain.  (AR 539.)  Dr. Abdu concluded, "I
think surgical intervention would be a reasonable consideration."  (AR 539.)  On
December 15, 2004, the technician was unable to obtain an MRI due to Ghio's
claustrophobia.  (AR 536.)

On December 30, 2004, a registered nurse noted that Ghio called the Spine Center
requesting pain medication.  (AR 533.)  Ghio stated that she had already called her
primary care provider, and that the office declined to give her any medication and
directed her to call the Spine Center.  (AR 533.)  The nurse at the Spine Center called the
office of the primary care provider, and the office stated that there was "no record of
patient calling PCP's office for pain medications in past, she states she will call patient to
discuss.  Call placed to patient to inform her that PCP's nurse will be calling her."  (AR
533.)

An MRI was obtained on January 7, 2005, and additional images were taken on
February 3, 2005.  (AR 512, 510.)  Dr. Abdu obtained an informed surgical consent on
February 3, 2005, and Ghio was scheduled for surgery.  (AR 509.)  The operative report
dated March 10, 2005 indicated that Ghio tolerated the posterior spinal fusion surgery

well.  (AR 478.)  At discharge on March 13, 2005, Ghio was prescribed Colace,

oxycodone, and acetaminophen for pain.  (AR 427.)  About two weeks later, Ghio called

the Spine Center complaining that she was experiencing pain and numbness, and that the

pain was impacting her ability to walk.  (AR 425.)  The nurse told Ghio that she was

"early in her postoperative period and that the pain she is experiencing did not sound

atypical."  (AR 425.)  Dr. Abdu prescribed Vicodin, to be supplemented by Tylenol and

acetaminophen.  (AR 425.)

At the appointment on April 28, 2005, Dr. Hazard reviewed new x-rays.  (AR

423.)  The x-rays suggested "that the right-sided hardware may have migrated slightly.

There is a change in radiographic technique so this is somewhat unclear.  . . . it appears to

be the right side, which is not the side on which she was noting her numbness as best as I

can tell."  (AR 423.)  Dr. Hazard concluded that if Ghio's symptoms got worse, she might

require a "revision."  (AR 423.)  Dr. Hazard stated that he would first review a new CAT

scan.  (AR 423.)  Dr. Hazard noted that "her back pain seems to be doing well."  (AR

423.)  On May 9, 2005, Ghio called the Spine Center again requesting additional pain

medication.  (AR 422.)  Dr. Abdu prescribed Vicodin.  (AR 422.)

On May 17, 2005, Dr. Abdu examined x-rays taken earlier that day.  (AR 421.)

He found that the x-rays

> demonstrate[d] no malalignment.  The right L4 screw appears to be little
> lateralized.  The lateral view suggests good alignment of the hardware and
> spine, although this is in distinction to her previous x-ray where there
> appeared to be some shifting in the hardware, although it was unclear as to
> whether this was due to the technique of the x-ray.  In any event, with
> regards to her exam, which is normal, and her x-ray which shows a joint
> graft, the specific etiology of her symptoms remains a little unclear.

17

(AR 421.)  Dr. Abdu stated that an additional CT scan would allow him "to evaluate positionally the hardware."  (AR 421.)  A Radiology Report on the same date found that the screws were appropriately positioned and that there were no abnormalities.  (AR 419.)  Dr. Abdu found no evidence of any nerve root compression.  (AR 418.)

On June 3, 2005, Ghio called the Spine Center and stated that she was not sure how much longer she could tolerate the pain.  (AR 417.)  Ghio's pain medications were increased.  (AR 417.)  On June 15, 2005, a myelogram was performed.  (AR 416.)  The radiologist found some disc herniation causing compression of the distal cord, but found no fracture or migration related to the fusion surgery.  (AR 410.)  There was no evidence of nerve root compromise.  (AR 410.)  Dr. Abdu reviewed the results on June 21, 2005, and found "no evidence of canal compromise, nerve root compression, disc herniation, bone spurs, foraminal narrowing, or other nerve impingement type pathology.  (AR 401.)

On June 21, 2005, Ghio was referred to an aquatherapy program with the intention that she eventually return to regular exercise after a physical therapy examination.  (AR 408, 402-03.)  At Dr. Abdu's request, the physical therapist observed Ghio exhibit strong guarded movements, but nothing unusual in Ghio's gait, and that Ghio could heel walk, toe walk, and squat.  (AR 402.)  The physical therapist stated that while Ghio was "quite tender to palpation over the greater trochanter[,] I was not able to reproduce this pain with provocative maneuvers directed to the hip."  (AR 402.)  The physical therapist stated her belief that Ghio needed to be more active, and recommended that Ghio begin walking twice a day for fifteen minutes at a time.  (AR 402.)  On July 7, 2005, Ghio called to

advise the Spine Center that she is experiencing the "sensation that something in her back is sliding out when she bends forward." (AR 399.) Ghio advised that she missed a recent appointment with her primary care provider, but stated that she would reschedule. (AR 399.) The record does not indicate that Ghio engaged in aquatherapy as recommended.

On September 6, 2005, Ghio met with Dr. Abdu. (AR 400.) Dr. Abdu recorded that Ghio's complaints of pain continued, but that it was not "quite clear where to go from here." (AR 400.) Dr. Abdu stated that he would refer Ghio for a neurological work up, and that they might proceed with a CT scan or MRI to examine the sciatic nerve and sciatic notch. (AR 400.) Ghio called the Spine Center requesting pain medication on September 16, 2005, and she was prescribed Ultram. (AR 395.) In October 2005, a Nerve Conduction and Needle EMG procedure was performed. (AR 391.) The results of the test were within normal limits. (AR 391.)

### 5.     The Spine Institute – Fletcher Allen Health Care (2007)

Ghio was referred to the Spine Institute of New England in March 2007. Rayden C. Cody, M.D. observed Ghio move around the room and change position easily. (AR 604.) Dr. Cody observed full range of motion in the lumbar spine, with some pain during extension and flexion. (AR 604.) Dr. Cody found Ghio's "most significant finding" to be "tenderness with palpation." (AR 604.) Dr. Cody reviewed radiographs, and observed the fusion to be intact though there was some mild degenerative changes at L5-S1 and some "sacroiliac joint sclerosis bilaterally, although the joint space is well maintained." (AR 604.) Dr. Cody recommended that Ghio be referred to a physical therapist for a water exercise program as well as injections in the left sacroiliac joint and

19

greater trochanteric bursal.  (AR 604.)  He recommended follow up in six weeks.  (AR 604.)

The follow-up appointment occurred on April 26, 2007 after the recommended injections.  Dr. Cody stated that "[i]f anything[,] the injections made her worse."  (AR 602.)  Dr. Cody obtained a "single photon emission CT scan."  (AR 602.)  The scan showed "increased activity at the fusion site but also increased activity at the L5 posterior elements.  The flexion-extension views did not reveal any instability."  (AR 602.)  Dr. Cody recommended a referral for radiofrequency ablation, and that her primary care physician discuss treatment for depression and "psychological management to assist with coping strategies."  (AR 602.)  The notes indicate that another appointment would be scheduled for six weeks later, but there is no indication of further treatment by Dr. Cody.  (AR 602.)

### 6.    Susan Dumas, M.S., A.N.P.C.

Nurse Practitioner Susan Dumas began treating Ghio at the Center for Integrative Medicine in November 2007.  (AR 622.)  At the first appointment on November 13, 2007, Nurse Dumas noted Ghio's chief complaints as "sore throat, cough, plugged ears." (AR 622.)  The progress notes do not reflect any complaint about back pain, but Nurse Dumas did note that Ghio should be scheduled for an MRI.  (AR 622.)  On November 27, 2007, Nurse Dumas recorded that Ghio complained of increased low back pain.  (AR 612.)  Ghio stated that she was experiencing the sensation of something slipping in her back, as well as numbness.  (AR 612.)  An MRI had to be rescheduled in order to accommodate Ghio's claustrophobia.  (AR 612.)  On December 10, 2007 Nurse Dumas

stated that Ghio was suffering from lumbar radiculopathy.  (AR 606.)  Nurse Dumas

reduced Ghio's prednisone prescription, and continued Ghio on Darvocet for pain.  (AR

606.)

At Ghio's last appointment with Nurse Dumas that is in the record, Ghio's chief

complaints were a "chest cold, stuffy nose, head cold, cough."  (AR 605.)  Nurse Dumas

noted Ghio's upcoming appointment for an MRI.  (AR 605.)  A Radiology Report from

Mary Hitchcock Memorial Hospital states that an MRI was performed on February 8,

2008.  (AR 624-25.)  No interpretive information is included, but the findings included

no significant neural foraminal narrowing throughout the spine except at C6-C7, and

some disc herniation at T10-T11, T11-T12, and T12-L1.  (AR 624.)  In any event, there

was no compression of the spinal cord.  (AR 624-25.)  The radiologist's "impression"

was disc herniation at C6-C7, and only the "[e]xpected postoperative changes at L4-L5."

(AR 625.)

### 7.      Consultative Examinations

#### a.      Leslie Abramson, M.D. – Physical Residual Functional Capacity

On June 29, 2006, Leslie Abramson, M.D. rendered an opinion as to Ghio's

physical residual functional capacity ("RFC") after a review of Ghio's file.  (AR 561-68.)

Dr. Abramson reviewed the time period from May 2004 forward.  (AR 561.)  Dr.

Abramson found that Ghio was limited to lifting and/or carrying twenty pounds only

occasionally, and ten pounds frequently.  (AR 562.)  Dr. Abramson found that Ghio could

sit for about six hours in an eight hour work day, and could stand and/or walk for about

six hours in an eight hour work day.  (AR 562.)  Dr. Abramson found no limitation in Ghio's ability to push or pull.  (AR 562.)  Dr. Abramson noted that Ghio's doctors recommended that she participate in physical therapy and a walking program.  (AR 562.) Dr. Abramson found that the limitations to Ghio's activities of daily living as listed in Ghio's self-reporting were inconsistent with her documented normal gait, neurological examination, negative results from the straight leg-raising test, and the comfort level observed by the medical professionals.  (AR 563.)  Dr. Abramson stated that Ghio's allegations were only partially credible, and that the limitations listed by Dr. Abramson were "due to ongoing back pain following back surgery."  (AR 563.)  Dr. Abramson also concluded that Ghio was limited to occasionally stooping, kneeling, crouching, and crawling, but could frequently climb stairs and ladders, and balance.  (AR 563.)  Dr. Abramson found no manipulative, visual, or communicative limitations, and found that Ghio should avoid concentrated exposure to vibration.  (AR 564-65.)

> **b.** **Dean Mooney, Ph.D. & Stacy Shortle, Ed.D. – Mental Disability Assessment**

On July 20, 2006, Dean Mooney, Ph.D. and Stacy Shortle, Ed.D. conducted an examination of Ghio at the Maple Leaf Clinic.  (AR 569-72.)  Ghio recounted her work history, and described strong relationships with her mother and fiancé.  (AR 569-70.) Ghio stated that her pain level "has impacted her ability to carry out several daily living tasks."  (AR 570.)  Ghio stated that her depression and anxiety symptoms emerged after her back surgery in March 2005.  (AR 571.)  Dr. Mooney and Dr. Shortle stated that Ghio's affect was appropriate, she engaged in eye contact, and was alert.  (AR 571.)  The

doctors found Ghio's speech, articulation, and spontaneity to be typical.  (AR 571.)  Dr.

Mooney and Dr. Shortle found Ghio to be of average cognitive ability.  (AR 571.)  "She

did, however, express depressive and anxious symptoms relating to her physical pain and

subsequent change in lifestyle.  There were no signs of obsessions, paranoid ideation,

delusions, hallucinations, or magical thinking."  (AR 571.)  The doctors found Ghio's

thought process to be coherent, logical, and goal directed.  (AR 571.)  The doctors

concluded that Ghio's presentation

> suggests the presence of mild depressive and anxious symptoms resulting
> from physical pain she experiences and its subsequent impact on her ability
> to engage in daily living activities. . . . Her capacity for social relationships
> appears typical and she displays appropriate social skills.  Her memory and
> concentration, per her report, are typical and results from the MSE suggest
> little impairment.  She does report that she has emotional support from
> family and close friends but may benefit from more formal counseling.

(AR 571-72.)  The doctors stated in two different places in their report that during the

examination, Ghio was seated in a chair for approximately one hour, but that they did not

observe any pain behaviors or signs of discomfort even "as she walked to and from the

office.  Her gait appeared unaffected."  (AR 572.)

### c.   Joseph Patalano, Ph.D. – Psychiatric Review Technique

Psychologist Joseph Patalano reviewed Ghio's file and made findings in a

Psychiatric Review Technique report dated August 17, 2006.  (AR 574-87.)  Dr. Patalano

found that Ghio met the criteria for affective disorders, but did not have any severe

impairments.  (AR 574.)  Dr. Patalano stated that during the period from May 8, 2004

through the date of the report, Ghio had an adjustment disorder mixed with anxiety and

depressed mood.  (AR 577.)  He found mild limitations in Ghio's activities of daily

living, her ability to maintain social function, and her ability to maintain concentration, persistence, and pace.  (AR 584.)  Ghio did not have any episodes of decompensation of extended duration.  (AR 584.)  Dr. Patalano found that Ghio's allegations were only partially credible as they were not supported by the medical records or the in-person consultative examination.  (AR 586.)  He concluded that any psychological impairment was not severe.  (AR 586.)

### d.      William Farrell, Ph.D. & Cynthia Short, M.D.

On reconsideration, William Farrell, Ph.D. examined Ghio's file.  In a report dated January 30, 2007, he stated that Ghio did not allege any changes in existing conditions or new conditions with respect to psychological issues.  (AR 599.)  He found that recently submitted medical records did not require any adjustment to the RFC.  He affirmed the August 17, 2006 assessment.  (AR 599.)

Cynthia Short, M.D. reviewed Ghio's file on reconsideration with respect to Ghio's alleged physical impairments.  (AR 598.)  In a report dated January 29, 2007, Dr. Short wrote that Ghio had not reported any worsening or change in her symptoms to her primary care provider.  (AR 598.)  Dr. Short also found that Ghio had not followed up with a physical therapist, and was not engaging in rehabilitative medicine.  (AR 598.)  Dr. Short affirmed the assessment dated August 17, 2006.  (AR 598.)

**Procedural History**

On April 19, 2006, Ghio applied for DIB and SSI, alleging that she became disabled in early May 2004.  (AR 86-92, 93-100.)  Ghio's application was denied initially and upon reconsideration.  (AR 42-45, 50-53, 57-60.)  She timely requested an administrative hearing, which occurred on September 2, 2009.  (AR 64, 22-35.)  Ghio appeared and testified at the hearing, and was represented by counsel.  (AR 24.)  On March 28, 2008, Administrative Law Judge ("ALJ") Ruth L. Kleinfeld issued a decision finding that Ghio was not disabled under the Social Security Act from May 1, 2004 through the date of the decision.  (AR 21.)  On January 25, 2010, the Appeals Council declined to review the ALJ's decision, making it the final decision of the Commissioner. Having exhausted her administrative remedies, Ghio timely filed the instant action on March 25, 2010.  (Doc. 1.)

**ALJ Decision**

I.     **Five-Step Sequential Evaluation Process**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).

The claimant is presumptively disabled if the impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to

consider whether the claimant's "residual functional capacity" ("RFC") precludes the

performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The

fifth and final step requires the ALJ to determine whether the claimant can do "any other

work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving

his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a

"limited burden shift to the Commissioner" to "show that there is work in the national

economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)

(clarifying that the burden shift to the Commissioner at step five is limited, and the

Commissioner "need not provide additional evidence of the claimant's residual functional

capacity").

## II.    ALJ's Written Decision

Employing this five-step analysis, ALJ Kleinfeld first determined that Ghio was

insured for DIB through December 31, 2009, and that Ghio had not engaged in

substantial gainful activity since the earlier alleged onset date of May 1, 2004.  (AR 13.)

At step two, the ALJ found that Ghio had one severe impairment, back pain "status post

fusion L4-5."  (AR 13.)  At the third step, the ALJ found that Ghio's medically

determinable impairments did not meet or equal one of the impairments in the Listings.

(AR 14.)  The ALJ stated the description of Listing 1.04, and determined that Ghio's

symptoms did not meet that description because she "maintains normal gait and station, negative straight leg testing and normal motor, sensory and reflex function." (AR 14.) The ALJ stated that while she "does not doubt that the claimant may well experience pain and discomfort in her back, such is not established, through substantial evidence to be of disabling proportions. Accordingly, the undersigned cannot credit her testimony regarding pain to the extent she has alleged." (AR 20.) At step four, the ALJ found that Ghio's RFC limits her to light work, that she is limited to carrying and lifting twenty pounds occasionally and ten pounds frequently, and that she should not be exposed to vibration. (AR 14.) The ALJ found that Ghio is capable of performing her past relevant work as an assistant store manager, and that work activities associated with that job are not precluded by the limitations in Ghio's RFC. (AR 21.) Because the ALJ found that Ghio could perform her past relevant work, he did not engage in the five-step analysis of whether Ghio can perform jobs that exist in significant numbers in the national economy.

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a

"review [of] the administrative record *de novo* to determine whether there is substantial

evidence supporting the . . . decision and whether the Commissioner applied the correct

legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v.*

*Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual

review of the Commissioner's decision is limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.*

*Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence" is more than a mere

scintilla; it means such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28

L.Ed.2d 842 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*,

566 F.3d at 305.

In determining whether an ALJ's findings are supported by substantial evidence,

the court must consider "the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also include that which

detracts from its weight."  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

Additionally, the court "'must . . . be satisfied that the claimant has had a full hearing

under the Commissioner's regulations and in accordance with the beneficent purposes of

the [Social Security ] Act.'"  *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999)

(quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  In reviewing the evidence, the

court must determine if the ALJ set forth the "crucial factors" justifying his or her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Willis v. Comm'r of Soc. Sec.*, 2008 WL 795004, at *1; *see also Ferraris v. Heckler*, 728 F.2d at 587.

The reviewing court's role with respect to the Commissioner's disability decision is "'quite limited[,] and substantial deference is to be afforded the Commissioner's decision.'" *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quoting *Burris v. Chater*, No. 94 Civ. 8049, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)). The court should not substitute its judgment for that of the Commissioner. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). The Second Circuit explained: "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the Secretary, and to reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having 'rational probative force.'" *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Consol. Edison Co.*, 305 U.S. at 230).

Therefore, if the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

### Analysis

Ghio argues that the ALJ's decision is not supported by substantial evidence for two principal reasons, both of which center around the ALJ's step-four findings.  First, Ghio argues that in every job she has previously performed, she was required to lift twenty-five pounds frequently and stand for eight hours.  (AR 3.)  Given this fact, she claims that the limitations prescribed by the ALJ's RFC finding preclude her from performing her past relevant work.  (AR 3-4.)  Second, Ghio argues that the ALJ's findings as to Ghio's credibility are not supported by substantial evidence.  (AR 4-16.) The Court will address each of these claims below.

### I.      Credibility

The ALJ decided that Ghio's testimony, "to the extent that it is construed to indicate that she is incapable of all examples of vocational functioning due to pain . . . cannot be accorded controlling weight in this case."  (AR 20.)  The ALJ essentially found that Ghio was not a credible reporter of her symptoms, and that the medical evidence did not demonstrate that Ghio "is precluded from all areas of physical functioning."  (AR 20.)

When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; *see McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 704-05 (2d Cir.1980), but the ALJ is not required to accept the claimant's subjective complaints without question.  Rather, the ALJ may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979).

The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a); *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983) ("[D]isability requires more than mere inability to work without pain. To be disabling, pain must be so severe . . . as to preclude any substantial gainful employment."). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Id.* The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in . . . administrative proceedings." 20 C.F.R. § 404.1512(b)(3); *see also* 20 C.F.R. § 404.1529(a).

It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Id.* (citing *McLaughlin*, 612 F.2d at 704). "When

evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (S.S.A. Jul. 2, 1996).

In this case, the ALJ found that Ghio's impairments "could reasonably be expected to produce the alleged symptoms."  (AR 16.)  However, at the second step of the credibility determination, the ALJ found that Ghio's statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible.  (AR 16.)  The Court first notes the complete lack of statements from Ghio's many medical providers regarding Ghio's functional limitations.  The record does not indicate the reason for this absence, but the result is that no treating physician or other medical provider has rendered an opinion as to Ghio's RFC or whether Ghio is disabled.  The only opinion evidence on which the ALJ relied was the consultative examiners' opinions, which were rendered after a review of Ghio's medical records.

The Commissioner cites to cases and suggests that the fact that Ghio's doctors have not rendered opinion statements in her favor may be weighed against her.  However, the regulations state that "the lack of [a] medical source statement will not make the [medical] report incomplete."  20 C.F.R. § 404.1513(b)(6).  Medical opinions are, in any event, examined within the context of the entire medical record.  20 C.F.R. § 404.1527.  Here, the ALJ has included a detailed examination of Ghio's medical history as part of her decision.  (AR 14-20.)

The ALJ also considered Ghio's self-reporting in her Function Report (AR 109-16) and her Pain Report (AR 143-52).  Ghio argues that both of these documents should

have been accorded more weight.  (Doc. 8 at 5-9.)[3]  The Commissioner concedes that in

one respect, the ALJ improperly relied on a statement as to Ghio's hobbies and interests.

(Doc. 11 at 11.)  Specifically, the ALJ stated that Ghio's hobbies included camping and

swimming.  (AR 20.)  However, the record is clear that while Ghio listed those activities

as hobbies and interests, she also stated that she could no longer engage in those activities

because of her pain levels.  (AR 113.)  The Commissioner argues that this error was

harmless because the ALJ also relied on medical findings and Ghio's course of treatment

in support of the ALJ's credibility and RFC findings.  (Doc. 11 at 11.)  The Court agrees

with the Commissioner, and finds the ALJ's error regarding Ghio's hobbies and interests

harmless.

　　　While filling out the Function Report, Ghio declined to limit herself to "yes" or

"no" answers, instead giving additional detail as to her limitations on almost every

question.  Ghio argues that these more nuanced responses support her claim of disability,

and that the detail she provided was not considered by the ALJ.  Citing to the Function

Report, however, the ALJ found that Ghio is able to care for her personal needs.  (AR

20.)  Ghio apparently argues that she is limited in her ability to care for her personal

needs because (a) she is able to take only ten minute showers due to her limited ability to

stand for extended periods; (b) she has some difficulty bending over to tie her shoes and

shave her legs; and (c) she has to sit down to do her hair.  (AR 113.)  The Court finds this

---

[3]  This section of Ghio's motion is marked by the inclusion of significant portions of Ghio's handwritten Function Report.  Portions of the Pain Report appear to have been cut from the Function Report and pasted into the motion.  Ghio appears to put forward a compare-and-contrast type of argument by stating "The ALJ found:" followed by a statement from the ALJ decision, just above a portion of the Function Report.  Unfortunately, however, Ghio does not attempt to contextualize this information, or offer any argument as to why any difference may be significant, except to say that "the evidence actually supports disability and is very different than as found by the ALJ."  (Doc. 8 at 5.)

argument unavailing, noting that the record demonstrates that, although Ghio is limited in her ability to perform certain tasks, she is able to care for her personal needs, clean her apartment, do laundry, prepare simple meals, care for her dog, shop, drive a car, and go out to dinner.

Moreover, the Function Report's reliability is questionable, given that there are statements contained therein which are inconsistent with the objective evidence.  (*See* AR 109-16.)  Specifically, Ghio writes in the Report – which is dated May 12, 2006 – that she attends physical therapy two-to-three times per week.  (AR 113.)  The record does not support this statement, however, instead revealing that Ghio engaged in physical therapy only during May and June of 2004 and April and May of 2006.  (AR 385-87, 294-97, 300-02.)  The treatment plan in 2004 was to engage in physical therapy three times a week for two weeks, and then to reduce the frequency of sessions.  (AR 385.) Ghio attended five sessions of physical therapy during that time period.  (AR 385-87.)  In June 2005, Ghio was assessed by a second physical therapist, but the medical records do not indicate that Ghio actually engaged in a course of physical therapy at that time.  (AR 402.)  In April and May 2006, Ghio attended four physical therapy appointments (AR 294-97, 300-02), but on May 9, 2006, she called the physical therapist's office and cancelled all future appointments (AR 302).  On May 11, 2006, Ghio was discharged from the physical therapy practice for non-compliance (AR 302), and there is no indication in the record that Ghio attempted to resume physical therapy on a later date. At the time Ghio asserted her regular attendance at physical therapy sessions in her May 12, 2006 Function Report, she would have been aware of her recent cancellation of all

future physical therapy appointments, yet there is no mention of such cancellation in the Report.

Ghio argues that "[e]ven the suggestion that she willingly failed to attend to Physical Therapy is undermined by the reports that she did not do so on a regular basis because of heavy bleeding that resulted in a hysterectomy and increased pain on attending it." (Doc. 8 at 14.)  The Court notes that Ghio's hysterectomy was performed in October 2006.  (AR 588-97.)  To the extent that the physical symptoms associated with a hysterectomy may excuse some attendance issues prior thereto, even after the surgery, it does not appear that Ghio made attempts to engage in physical therapy.

Ghio claims that she experienced increased pain after attending physical therapy. (Doc. 8 at 14.)  But the record demonstrates that on April 26, 2006, she told the physical therapist that she experienced relief after the initial assessment, including being able to sleep for a period of three hours, stating that "she was previously unable to sleep."  (AR 297.)  Ghio also noted "mild, yet satisfying relief," and stated that she was pleased with her progress.  (AR 297.)  At a May 3, 2006 appointment, the physical therapist noted that Ghio had canceled two recent appointments, and had "difficulty observing" that a pain reduction from ten out of ten to eight out of ten was an improvement.  (AR 300.)  Ghio attended only one other appointment after that.  (AR 301.)

Also on May 3, 2006, Ghio met with Dr. Lefkoe and complained that her pain was three times worse after a physical therapy session.  (AR 298.)  Despite this complaint, Dr. Lefkoe noted that, following physical therapy treatment, Ghio's "pain levels decreased and her pain became localized to the region of the left SI joint."  (AR

298.)  The Doctor was therefore encouraged that Ghio's pain level could be "reduced in frequency and scope during a single session."  (AR 299.)  Dr. Lefkoe also noted that Ghio had not yet attended enough physical therapy sessions for the efficacy of the treatment to be evaluated.  (AR 299.)  Dr. Lefkoe clearly intended that physical therapy be continued.  (AR 298-99.)  Moreover, he reduced Ghio's dosage of Lyrica, a pain medication, despite Ghio's complaints of increased pain due to physical therapy.  (AR 299.)

The Court finds that the objective medical evidence is inconsistent with Ghio's self-reporting regarding the frequency and duration of her physical therapy sessions. Especially troublesome is the timing of Ghio's statements in the Function Report, given her knowledge of the status of her appointments, as noted above.  Specifically, Ghio's statements in the Function Report were intended to reflect her current habits, and imply that she was attempting to comply with her doctors' recommendations.  However, Ghio knew at the time she completed the Report that she was discontinuing physical therapy on her own accord, despite her doctors' recommendations.  Thus, her statements to the contrary were not accurate.  Also of concern is Ghio's lack of effort to resume physical therapy after her hysterectomy, given her doctors' consistent referrals over the years to do so.

There are a number of other inconsistencies in the record that support the ALJ's credibility determination because they do not support Ghio's claims of *disabling* pain. For example, Ghio was consistently noted to move easily during examinations, walk with a normal gait, and have negative results from the straight leg-raising test both before and

after her lumbar fusion.  (AR 235, 256, 298, 309, 315, 402.)  Moreover, during the entire

period under consideration, Ghio did not experience sensory or motor loss in her

extremities or loss of strength.  (AR 235, 242, 309, 315.)  Although Ghio had several

noteworthy medical appointments where a significant symptom was noted, including

"worsening pain with straight leg raises" in November 2004 (AR 248), reproducible back

pain on a straight leg-raising test also in November 2004 (AR 539), strong guarded

movements in June 2005 (AR 402), heel and toe walking that increased her back pain in

November 2005 (AR 256), antalgic gait and pain-limited palpatory examination in

February 2006 (AR 284), and grabbing her low back during an examination in May 2006

(AR 298); Ghio's medical providers noted such significant symptoms only on isolated

occasions over a period of years, despite Ghio's consistent complaints of debilitating pain

during the same period.

     Furthermore, Ghio's doctors and other medical providers themselves noted

inconsistencies in Ghio's statements and description of her symptoms, leading them to

question her credibility.  For example, the record reveals that in December 2004, Ghio

requested pain medication from the Spine Center, stating that her primary care provider

had declined to arrange a prescription; but when the registered nurse from the Spine

Center called the primary care provider, the provider's office reported that there was no

record of any such request by Ghio.  (AR 533.)  Moreover, Dr. Lefkoe noted in his

description of one of Ghio's physical therapy sessions that Ghio "was initially able to

acknowledge [improved pain, and localization of the pain], and then denied it."  (AR

298.)  In February 2007, Dr. Giering stated that he believed Ghio's limited range of

motion was "effort-related."  (AR 315.)  At the same appointment, the Doctor observed the existence of "Waddell signs" (AR 315), which generally indicate either malingering or exaggeration of symptoms.[4]  He opined that Ghio's pain may have a psychological component, stating: "I think there is significant psychological overlay at work in this case."  (AR 316-17.)

Dr. Giering was also concerned about Ghio's non-compliance with recommended treatment, including attendance problems at appointments, and he observed that other doctors had the same difficulty eliciting compliance from Ghio.  (AR 316.)  Dr. Giering was dissatisfied with Ghio's explanation that she was in too much pain to attend an appointment with her pain management specialist, stating: "I frankly can not [sic] understand why a patient would stay in bed instead of attending an appointment [with their pain management specialist]."  (AR 316.)

For all of these reasons, the ALJ's determination that Ghio was not a credible reporter of her symptoms as to intensity, persistence, and limiting effects is supported by substantial evidence.  The ALJ considered the conservative approach taken by Ghio's treatment providers, as well as the other relevant factors in reaching his credibility determination.  Though Ghio's complaints to her doctors generally track with her self-reported symptoms and limitations, they are not consistent with the medical record of

---

[4]  There are eight "Waddell signs," which are indicators that a physician will look for when evaluating a patient complaining of back pain.  *See* ATTORNEYS MEDICAL DESKBOOK 4th, (4th ed. 2008), available at MEDDESK § 18:4. The existence of one or more of these signs "implies that the back pain has no physical cause.  One or two of these signs may arise from patient anxiety or eagerness to cooperate.  *Three or more are usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and to rule out physical abnormality.  Id.* (emphasis added).

assessment and treatment.  The ALJ was entitled to rely on the consultative examiners'
assessment, in light of the objective medical evidence and his credibility finding.

Ghio argues that the ALJ should have awarded Ghio benefits for a closed period
of disability for the period from her alleged onset date of May 1, 2004 through the three
months of doctor-sanctioned rest following her March 2005 surgery.  (Doc. 8 at 10.)
Given Ghio's failure to raise this issue before the ALJ, and failure to amend her claim to
request a closed period of disability, the Court need not consider it.  Even if the Court
were to consider the issue, the determination would be in the Commissioner's favor,
given that the ALJ's finding that Ghio was not disabled during the period following May
1, 2004 is supported by substantial evidence, even despite Ghio's March 2005 surgery
and subsequent three-month rest period.

## II.    Past Relevant Work

Ghio argues that "there is no evidence that supports the conclusion that [she] can
perform her Past Relevant Work."  (Doc. 8 at 4.)  The regulations define "past relevant
work" as "work that you have done within the past 15 years, that was substantial gainful
activity, and that lasted long enough for you to learn how to do it."  20 C.F.R. §§
404.1560 (b)(1) and 416.960 (b)(1).  The regulations require the Commissioner to
"compare our [RFC] assessment  . . . with the physical and mental demands of your past
relevant work.  If you can still do this *kind* of work, we will find that you are not
disabled."  20 C.F.R. §§ 404.1520(f) and 416.920(f) (emphasis added and internal
citations omitted).  The ALJ may consider evidence about the mental and physical
requirements of a claimant's past relevant work "either as the claimant actually

performed it or as generally performed in the national economy."  20 C.F.R. §§ 404.1560

(b)(2) and 416.960 (b)(2).  The Second Circuit has held that though a Social Security

plaintiff may not be capable of returning to her past relevant work, she is not precluded

from performing the work as it is generally performed throughout the national economy.

*Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981); *see Delaney v. Astrue*, No. 09-CV-

0251-A, 2010 WL 2629801, at *4 (W.D.N.Y. June 28, 2010).  "A claimant makes a

prima facie showing of disability only by establishing that he is unable to return to his

former *type* of work."  *Jock*, 651 F.2d at 135 (quotation marks and citations omitted)

(emphasis added).

 Ghio makes no argument as to whether her RFC precludes her from performing

the *type* of work she has performed in the past.  (Doc. 8 at 3-4.)  Instead, she concentrates

exclusively on whether she can perform the *actual* jobs she has performed.  (Doc. 8 at 3-

4.)  The Court first notes that there is some lack of clarity as to Ghio's most recent job at

Big Lots.  On her Work History Report, Ghio stated that her job title was "Customer

Service" (AR 119), that she was a supervisory employee, and that her duties included

working at the service desk and cashing out customers (AR 123).  Various health care

providers stated Ghio was a "cashier" at Big Lots.  (AR 402, 570.)  One of Ghio's

physical therapists stated that Ghio was "fairly emphatic that she wishes to return to work

as a cashier."  (AR 402.)  Drs. Mooney and Shortle recounted that Ghio had also been a

"cashier" at her previous positions at Stewart's and Mac's convenience stores.  (AR 570.)

 In any event, the ALJ specifically found that Ghio "is capable of performing past

relevant work as an assistant store manager."  (AR 21.)  The ALJ stated that Ghio "is able

to perform [the duties of an assistant store manager] as actually and generally performed." (AR 21.) In making this determination, the ALJ relied on Ghio's self-reporting that

> she prepared daily reports and trained and supervised two other employees. She ran the cash register on occasion. She was required to lift and carry items weighing 20 to 25 pounds on occasion. On occasion she stocked shelves. She would walk for about one hour, stand for about eight hours and sit for up to two hours.

(AR 21.) The ALJ found that Ghio could perform light work. (AR 14.) The Commissioner is correct that there are a number of inconsistencies in the Work History Report submitted by Ghio. (Doc. 8 at 6.) For example, Ghio reported that in her assistant manager positions at Mac's and Exxon convenience stores, the heaviest weight she lifted was twenty pounds. (AR 122-23.) However, she also reported that, in those same positions, she lifted twenty-five pounds frequently. (AR 122-23.) There are also inconsistencies in Ghio's reporting of the physical demands of her other past jobs. For example, in her assistant manager position at Stewart's convenience store, Ghio reported that she worked for eight hours each day, five days per week. (AR 120.) At the same time, she reported that during the course of this eight-hour day, she walked for eight hours, stood for eight hours, sat for one hour, and climbed for three hours, for a total of twenty hours. (AR 120.) Similarly, in her assistant manager position at Mac's convenience store, Ghio reported that she worked for eight-and-one-half hours each day, six days per week. (AR 121.) But then she conflictingly reported that during the course of this eight-and-one-half hour day, she walked for one hour, stood for eight hours, sat for two hours, and climbed for four hours, for a total of fourteen hours. (AR 121.) This is

the type of conflict in a claimant's self-reporting that ALJs are required to resolve. "Where, as here, the record is complete, the ALJ's task is to resolve the conflict by weighing the evidence at hand." *Rivenburg v. Comm'r of Soc. Sec.*, No. 09-CV-755 (NAM/VEB), 2010 WL 4362768, at *5 (N.D.N.Y. Oct. 12, 2010) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)), *adopted by* C.J. Mordue in *Rivenburg v. Comm'r of Soc. Sec.*, No. 1:09-CV-0755, 2010 WL 4338090 (N.D.N.Y. Oct. 27, 2010). Substantial evidence supports the ALJ's resolution of the conflict against Ghio.

Finally, the Court accepts the Commissioner's argument that an ALJ is entitled to take administrative notice of occupational information contained in vocational resources. (Doc. 11 at 5.)  "Assistant Manager" is not an occupational title that appears in the Dictionary of Occupational Titles ("DOT").  The Court has examined the positions of Retail Manager (185.167-046, 1991 WL 671299 (G.P.O.)) and Cashier II (211.462-010, 1991 WL 671840 (G.P.O.)) in the DOT.[5]  Both are classified as "light work," and both require exerting twenty pounds of force occasionally, and ten pounds frequently.  *Id*. This is entirely consistent with the limitations on Ghio's RFC as determined by the ALJ. The occupations as described in the DOT do not encompass every component of every

---

[5] The Court also examined "Manager, Department" and "Displayer, Merchandise."  (299.137-010, 1991 WL 672616 (G.P.O.); 298.081-010, 1991 WL 672613 (G.P.O.).)  These occupational titles appear related to Ghio's prior employment because they include some tasks that Ghio claims to have performed as part of her past relevant work.  These jobs are both classified as "medium work," and require the ability to exert twenty to fifty pounds of force occasionally and ten to twenty-five pounds frequently.  *Id*.  Ghio has not disputed the ALJ's finding of RFC.  Significantly, she does not claim that her past relevant work is more similar to "medium work" than the "light work" that corresponds to her RFC.  However, to the extent that such a claim may be construed from Ghio's argument that she cannot perform her past relevant work, the Court finds that Ghio's job duties as assistant manager more closely align with the job title of "Retail Manager" than "Manager, Department" or "Displayer, Merchandise" as described in the DOT.  The Court notes that the inconsistencies in Ghio's statements about her past relevant work required the ALJ to resolve the matter, and finds that substantial evidence supports the ALJ's determination that Ghio's past relevant work most closely approximated "light work."

job, but are representative of occupations as they are generally performed in the national economy.  SSR 82-61, 1982 WL 31387 at *1-2.  SSR 82-61 explicitly states that it "is understood that some individual jobs may require somewhat more or less exertion than the DOT description."  *Id.* at *2.  Ghio may have performed some duties in her past employment that are in some ways more exerting than "light work," but substantial evidence supports the ALJ's determination that Ghio's RFC is consistent with her past relevant work as it is generally performed in the national economy.

## Conclusion

For the reasons stated above, Ghio's motion to reverse the Commissioner's decision (Doc. 8) is DENIED, and the Commissioner's motion to affirm such decision (Doc. 11) is GRANTED.  The decision of the Commissioner is hereby AFFIRMED.


Dated at Burlington, in the District of Vermont, this 4th day of March, 2011.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge